**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", <br><br> Defendants. | Case No. 23-cv-00854 <br><br> **Judge Joan B. Gottschall** <br><br> **Magistrate Judge Jeffrey Cummings** |

## DECLARATION OF PAUL VARLEY

I, Paul Varley, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am currently retained by Epic Games, Inc. ("Plaintiff") as a consultant. I am knowledgeable about, or have access to, business records concerning all aspects of Plaintiff's brand protection operation including, but not limited to, its trademarks, copyrights, sales, licensees, online sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Plaintiff, Epic Games, Inc., is a privately held American corporation having its principal place of business in North Carolina and is the owner of the trademarks asserted in this action. Epic, founded in 1991 by Tim Sweeney, is one of the world's leading interactive entertainment companies. Epic develops some of the most widely used 3D engine

1

        technology in the video game industry and operates some of the world's most popular video games.

4.   Epic's 3D engine technology, known as Unreal Engine, is the lifeblood that powers the world's leading video games and has been implemented outside of the video game industry in areas such as television, film, architecture, automotive, manufacturing, and simulation. Through its Unreal Engine, online game store, and online services, Epic provides an end-to-end digital ecosystem for video game developers and creators to build, distribute, and operate games and other content. While Epic's contributions to the video game industry and 3D technology industry at large have been immeasurable, Epic is perhaps best known for operating one of the world's most popular video games – *Fortnite*.

5. *Fortnite* is an online video game that was originally released in 2017. *Fortnite*'s most popular game mode is Battle Royale. "In [*Fortnite*], battle royale means up to 100 players on a single map trying to be the last person or squad standing as the safe zones get smaller and smaller, forcing all remaining players together."[1] While *Fortnite* was not the only game which offered this type of game mode, it had the unique feature of having players gather materials to use those materials to create structures. Players use "the building mechanics of the core game, so [they] can create platforms and walls to either get a better vantage point or hide from enemy fire. These structures aren't impenetrable – you can't just build four walls and a roof and call it a day."[2] What resulted was one of the most fun

---

[1] https://www.nbcnews.com/tech/tech-news/what-fortnite-look-video-game-has-become-phenomenon-n887706
[2] *Id.*

and unique multiplayer game experiences ever, resulting in a level of pop culture ubiquity for *Fortnite* that few video games ever realize.[3]

6. Today, *Fortnite* features several additional game modes and players have created over 400 million accounts for *Fortnite* worldwide, with Epic hosting competitive events across various regions for players to participate in. *Fortnite* has also won numerous awards since its release, including: (1) the 2018 and 2019 Best Ongoing Game Award at The Game Awards, (2) the 2019 BAFTA Award for Best Evolving Game, (3) the 2019 Best Multiplayer/Competitive Game Award at the Webby Awards, and (4) the 2019 eSports Game of the Year at the Golden Joystick Awards.

7. Epic markets and sells a variety of products emanating from *Fortnite*, including apparel such as hoodies, onesies, t-shirts, and shorts; plush dolls; accessories like pins, keychains, stickers, phone cases, masks, and bags; and other merchandise bearing Epic's trademarks (collectively, "Fortnite Products"). Fortnite Products have become enormously popular and even iconic, driven by Epic's quality standards and innovative designs. Among the purchasing public, Fortnite Products are instantly recognizable as such. Fortnite Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as Target, Walmart, and Kohl's, and through Epic's official Amazon store https://www.amazon.com/fortnite.

8. Epic has used the FORTNITE and EPIC GAMES trademarks, and other trademarks, for many years and has continuously sold products under its trademarks (collectively, "Fortnite Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in the Fortnite Trademarks. Epic's use of the marks has also built substantial

---

[3] *See* https://www.businessinsider.com/fortnite-most-influential-video-game-decade-2019-12.

goodwill in the Fortnite Trademarks. Fortnite Trademarks are famous marks and valuable assets of Epic. Fortnite Products typically include at least one of the Fortnite Trademarks.

9. The Fortnite Trademarks are registered with the United States Patent and Trademark Office. True and correct copies of the federal trademark registration certificates for the Fortnite Trademarks are attached hereto as **Exhibit 1**. The Fortnite Trademarks are valid, subsisting, and in full force and effect.

10. The Fortnite Trademarks are exclusive to Epic and are displayed extensively on Fortnite Products and in marketing and promotional materials. The Fortnite Trademarks are also distinctive when applied to Fortnite Products, signifying to the purchaser that the products come from Epic, or its licensees, and are manufactured to Epic's quality standards. Whether Epic manufactures the products itself or contracts with others to do so, Epic has ensured that products bearing the Fortnite Trademarks are manufactured to the highest quality standards.

11. The Fortnite Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been continuously used and never abandoned. The success of *Fortnite*, in addition to the marketing of Fortnite Products, has enabled the Fortnite brand ("Fortnite Brand") to achieve widespread recognition and fame and has made the Fortnite Trademarks some of the most well-known marks in the video game, entertainment, and merchandising industries. The widespread fame, outstanding reputation, and significant goodwill associated with the Fortnite Brand have made the Fortnite Trademarks valuable assets of Epic.

12. Products bearing the Fortnite Trademarks have been the subject of substantial and continuous marketing and promotion. Epic has marketed and promoted, and continues to

market and promote, the Fortnite Trademarks in the industry and to consumers through traditional print media, authorized retailers, social media sites, point of sale material, and its own Amazon store found at https://www.amazon.com/fortnite.

13. Epic has expended substantial time, money, and other resources advertising, promoting, and marketing Fortnite Products. Fortnite Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Fortnite Brand. As a result, products bearing the Fortnite Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Epic or Epic's licensees. The Fortnite Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the Fortnite Trademarks is of immeasurable value to Epic.

14. Fortnite Products are sold only by Epic or through authorized licensees and are recognized by the public as being exclusively associated with the Fortnite Brand.

15. The success of *Fortnite* has resulted in significant counterfeiting of the Fortnite Trademarks. Because of this, Epic has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Epic has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms such as AliExpress.com ("AliExpress"), Alibaba Group Holding Limited ("Alibaba"), Amazon.com, Inc. ("Amazon"), Dhgate.com ("DHgate"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), Fruugo.com Limited ("Fruugo"), ContextLogic, Inc. d/b/a Wish.com ("Wish"), and Walmart, Inc. ("Walmart"), including the e-commerce stores operating under the Seller

Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States.

16. I perform, supervise, and/or direct investigations related to Internet-based infringement of the Fortnite Trademarks. Our investigation shows that Defendants are using the Seller Aliases to sell Unauthorized Products, from primarily Asian countries or other foreign jurisdictions, to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the e-commerce stores operating under the Seller Aliases and determined that Unauthorized Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed for sale on each e-commerce store, the price at which the Unauthorized Products were offered for sale, other features commonly associated with e-commerce stores selling counterfeit products, and because Defendants and their e-commerce stores do not conduct business with Epic and do not have the right or authority to use the Fortnite Trademarks. Additionally, each e-commerce store offered shipping to the United States, including Illinois. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 2**.

17. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offering shipping to the United States, including Illinois, accepting payment in U.S. dollars and, on information and belief, selling Unauthorized Products to residents of Illinois.

18. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing e-commerce

stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Epic has not licensed or authorized Defendants to use the Fortnite Trademarks and none of the Defendants are authorized retailers of Fortnite Products.

19. Many Defendants also deceive unknowing consumers by using the Fortnite Trademarks within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to the Fortnite Products. Other e-commerce stores operating under Seller Aliases omit using the Fortnite Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Fortnite Products.

20. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

21. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

22. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

23. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and through websites such as sellerdefense.cn, ikjzd.com, kaidianyo.com, and kuajingvs.com. These websites provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. The websites also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

24. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Epic's enforcement efforts. E-commerce store operators like Defendants maintain off-shore bank accounts and

regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

25. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Epic, have jointly and severally, knowingly and willfully used and continue to use the Fortnite Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

26. Monetary damages alone cannot adequately compensate Epic for ongoing infringement because monetary damages fail to address the loss of control of and damage to Epic's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Epic's reputation and goodwill by acts of infringement.

27. Epic's goodwill and reputation are irreparably damaged when its trademarks are used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Epic. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Epic's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

28. Epic is further irreparably harmed by the unauthorized use of the Fortnite Trademarks because counterfeiters take away Epic's ability to control the nature and quality of the Unauthorized Products. Loss of quality control over goods offered for sale or sold under

the Fortnite Trademarks and, in turn, loss of control over Epic's reputation is neither calculable nor precisely compensable.

29. The use of the Fortnite Trademarks in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Epic is likely causing and will continue to cause consumer confusion, which weakens Epic's brand recognition and reputation. Consumers who mistakenly believe that the Unauthorized Products originate from Epic will come to believe that Epic offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with Fortnite Products, resulting in a loss or undermining of Epic's reputation and goodwill. Indeed, there is damage to Epic's reputation and goodwill even if a consumer knows the goods they are purchasing are counterfeit. Prospective consumers who see Unauthorized Products used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Epic and the Fortnite Trademarks. Such post-sale confusion results in damage to Epic's reputation and correlates to a loss of unquantifiable future sales.

30. Epic is further irreparably damaged due to a loss of exclusivity. Fortnite Products are meant to be exclusive. Epic's extensive marketing efforts and distribution of Fortnite Products are aimed at growing and sustaining sales of Fortnite Products. The Fortnite Trademarks are distinctive and signify to consumers that the products originate from Epic and are manufactured to Epic's high-quality standards. When counterfeiters use the Fortnite Trademarks to offer for sale or sell goods without Epic's authorization, the exclusivity of Epic's products, as well as Epic's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

31. Epic will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 8th, 2023, at London, United Kingdom.

/s/ 
Paul Varley